HAROLD T. BRADLEY AND ELIZABETH A. BRADLEY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3117–69.  Filed October 4, 1971.

*Samuel J. Foosaner*, for the petitioners.
*James A. McNabb*, for the respondent.

ATKINS, *Judge:* The respondent determined a deficiency in income tax against the petitioners for the taxable year 1965 in the amount of $21,438.75 and additions to tax under section 6651(a) of the Internal Revenue Code of 1954 in the amount of $5,359.68 and under section 6653(a) of the Code in the amount of $1,291.84. The issues pre-

1

sented for decision in this case are (1) whether an amount of $32,000 received by the petitioners during 1965 was held under a claim of right and hence includable in their income; (2) whether petitioners are entitled to a deduction as an ordinary and necessary business expense for amounts claimed as travel and entertainment expenses; (3) whether petitioners are entitled to a deduction as an ordinary and necessary business expense for expenses claimed for their summer home facilities; (4) whether the petitioners' failure to file their 1965 joint Federal income tax return within the time prescribed by law was due to reasonable cause; and (5) whether some part of the underpayment of tax was due to negligence or intentional disregard of rules and regulations.

FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by this reference.

Harold T. Bradley and Elizabeth A. Bradley are husband and wife and were such during the taxable year 1965. At the time of the filing of the petition herein they were residents of West Orange, N.J. Their joint Federal income tax return for the taxable year 1965 was delinquently filed. As a matter of convenience Harold T. Bradley will hereinafter be referred to as the petitioner.

During 1965, and for some time prior thereto, petitioner operated a sole proprietorship in Newark, N.J., under the trade name of "Bradley & Co.," engaging in the business of corporate insurance brokerage. During a portion of 1965, and for some time prior thereto, he was also employed by the New York Central Railroad, in its offices in New York City, as an assistant insurance manager.

In operating his brokerage business, petitioner maintained a brokerage account with Donnelly Bros., a corporation whose main office was in Millburn, N.J. Donnelly Bros. acted as the general agent for numerous insurance companies and would place insurance coverage with various companies at petitioner's request. Under the terms of an agreement in effect during 1965, Donnelly Bros. was to pay petitioner a stated percentage of all commissions that accrued to it on account of placing insurance coverage for the New York Central Railroad. Donnelly Bros. directly handled the transactions with the New York Central Railroad. Normally, it would bill the railroad for premiums for the coverage placed. Upon receiving payment, Donnelly Bros. would remit the net premiums to various insurance companies with which the coverage had been placed and retain the difference as commission. It would then pay the petitioner his percentage of the commission.

During 1965 and for some time prior thereto, James Hillary was the manager of the New York Central Railroad's insurance department. It was the responsibility of Hillary's department to secure insurance coverage for property either owned by, or in the custody of, the New York Central Railroad. Petitioner assisted Hillary in securing such coverage.

During June 1964, the New York Central Railroad was in need of some special insurance coverage. It was a major carrier of new automobiles to the eastern United States and there was a strike impending that would force it to store a large number of such automobiles on various unused properties that it owned. It wanted to obtain insurance coverage for the possible loss involved. Late in the afternoon of one business day in June an operating vice president called Hillary and told him to secure insurance coverage for the risk by the close of business the next day.

The type of insurance coverage involved was available only under a contingency commission arrangement. Under such an arrangement, no part of the premium paid is initially treated as commission. The broker, or brokers, however, retains 80 percent of the premium and remits the balance to the insurance company. The broker will pay claims arising under the policy out of the amount retained. If the claims exceed this amount, the insurance company is liable for the excess. If the broker has any amount remaining after paying the claims it is then treated as his commission.

Hillary discussed the problem of securing this coverage with petitioner. Hillary called a number of different brokers with whom the New York Central Railroad did business. These brokers indicated that they would be unable to act as quickly as was necessary. Hillary then called Matthew Derham, an underwriter in Donnelly Bros.' New York City office. Derham indicated that it would be difficult to obtain such coverage, but that he would try. Hillary had to leave his office to attend a meeting and, after informing petitioner of his call to Derham, he asked petitioner to follow the matter up because of the need to secure the coverage by the end of that day.

Derham made a number of inquiries trying to place the coverage, but he was unable to do so at an acceptable price. When Hillary returned to his office later that day, petitioner told him that Derham had indicated that the coverage had been completed. As a result, Hillary was under the impression that the coverage had been secured.

Subsequently, petitioner asked Derham to arrange for it to appear that the requested coverage had been secured by Donnelly Bros. Petitioner told Derham that he had taken care of the placement of coverage himself through other sources. He asked Derham to have

4

Donnelly Bros. supply a cover note to the New York Central Railroad as evidence of the coverage and to arrange for Donnelly Bros. to bill the railroad for the premium and then remit it to him so that he could pay the people with whom he had placed the coverage. Petitioner had in fact never placed such coverage.

When he received a cover note on Donnelly Bros. letterhead indicating that the coverage had been placed, Hillary accepted it as proof that it had been obtained since in the past he had accepted similar cover notes as proof of coverage. As often happened with special types of coverage, the New York Central Railroad was billed by Donnelly Bros.' New York City office many months after the above events. In 1965, the railroad paid Donnelly Bros. about $48,000, which was the amount billed as the premium.

On May 27, 1965, Frank Donnelly, the president of Donnelly Bros., authorized a check to petitioner in the amount of $32,024.18. Donnelly had been advised by Derham that petitioner had placed the coverage which Donnelly Bros. had been unable to place. In a memorandum to Donnelly, Derham also indicated that Donnelly Bros.' New York City office had billed the New York Central Railroad for the premium for such coverage and that the premium received should be forwarded to petitioner. Since the payment of the premium was made through Donnelly Bros., it was entitled to a commission. Donnelly decided to keep around $15,000 of the premium as Donnelly Bros.' share since this special coverage involved a contingency commission arrangement. Donnelly authorized the payment of the remainder of the premium, amounting to $32,024.18, to petitioner as his share of the premium for this coverage. This amount was not a part of the commissions paid to petitioner by Donnelly Bros. under their arrangement concerning coverage placed for the New York Central Railroad by Donnelly Bros.

On May 28, 1965, petitioner deposited the check for $32,024.18 in the bank account maintained in the trade name of his sole proprietorship. He treated the amount as just another item of income and drew checks upon it.

In June 1965, Hillary had doubts for the first time about the existence of the special coverage for the automobiles. He had been visited by Donnelly who raised the question as to whether the coverage was in force. Hillary also learned for the first time of petitioner's relationship with Donnelly Bros. Hillary felt such an association was an unpermissible conflict of interest. He confronted petitioner with this suspicion about the coverage and asked for an explanation of the relationship with Donnelly Bros. When petitioner failed to make an adequate explanation, he was asked to resign. A few days later in July 1965 petitioner resigned.

After petitioner's resignation, Hillary learned that the special coverage on the automobiles had never been placed. After Donnelly learned that petitioner had not placed such coverage he arranged for Donnelly Bros. to refund to New York Central Railroad the share of the premium it had originally retained.

Some time after 1965, the New York Central Railroad instituted a civil suit against petitioner, Donnelly, Derham, Donnelly Bros., and an insurance company in the U.S. District Court for the District of New Jersey seeking a return of the portion of the premium paid to petitioner. On April 8, 1969, a consent judgment was entered against the petitioner in the amount of $20,000.

During 1965, petitioner also received the following amounts from Donnelly Bros.:

| Date | Amount | Date | Amount |
|---|---|---|---|
| January 21 | $11,992.24 | June 3 | $7,500.00 |
| January 21 | 12,639.67 | July 23 | 2,500.00 |
| May 27 | 11,849.89 | | |
| | | Total | 46,481.80 |

These amounts were paid to petitioner under the terms of the agreement as his percentage of the commissions earned by Donnelly Bros. on insurance coverage placed for the New York Central Railroad. Other than this, petitioner earned no substantial commissions from the operation of his brokerage business during 1965.

In connection with his brokerage business, petitioner incured expenses for travel and entertainment during 1965. In addition to the residence that he owned in West Orange, petitioner also owned a second home located on Barnegat Bay, which was used primarily in the summer. He also owned a boat, which he used in connection with his summer home.

On April 15, 1966, petitioner filed an application for an extension of time until June 15, 1966, to file his income tax return for the taxable year 1965. In support of his application, he stated as follows: "My records have not been completely compiled as of this date and therefore I cannot properly complete my return. I have engaged an accountant to do so and they have not completed the review of my records." Petitioner also indicated that he had not filed his returns for 1963 and 1964 on time and stated the reason as follows: "Due to my difficulties with the previous accountants, my returns have not been prepared and filed until a report was submitted by the IRS." On April 28, 1966, petitioner's application for extension was denied.

The joint Federal income tax return for the taxable year 1965 was signed by petitioner and his wife, but does not indicate the date of their signatures. The top of the first page of the return contains the following typewritten notation: "Delinquent return secured by Agent R. Blake June 12, 1968."

On the joint Federal income tax return for the taxable year 1965, petitioner reported gross receipts from the operation of his brokerage business in the amount of $47,921.32. Such amount did not include the amount of $32,024.18 received by petitioner from Donnelly Bros. on May 27, 1965. In computing the income from the operation of the brokerage business, petitioner deducted the amount of $16,537.83 as "Travel and Entertaining" and the amount of $1,914.82 as "50% Summer Home facilities and expenses allocated to Business."

In the notice of deficiency, the respondent determined that petitioner had received income in the amount of $32,000 from Donnelly Bros. which had not been reported and accordingly increased taxable income by $32,000. Respondent also disallowed $13,051.23 of the amount claimed for travel and entertainment expenses, stating that it had "not been established that any amount in excess of $3,486.60 represents an ordinary and necessary business expense or was expended for the purpose designated." He further disallowed the amount claimed for the summer home facilities, stating that it had not been established that such amount "represents an ordinary and necessary business expense or was expended for the purpose designated."

In the notice of deficiency, respondent also stated that it had not been shown that the failure to file the return within the time prescribed by law was due to reasonable cause and asserted a 25-percent addition to tax under section 6651(a) of the Code. He also determined that some part of the underpayment of tax was due to negligence or intentional disregard of rules and regulations and asserted a 5-percent addition to tax under section 6653(a) of the Code.

### OPINION

The first issue presented for decision in this case is whether an amount of $32,000 which was received by petitioner during 1965 from Donnelly Bros. and which was not reported by petitioner as income is includable in his income for the taxable year 1965. The respondent argues on brief that it is, citing *North American Oil Consolidated* v. *Burnet*, 286 U.S. 417, and *James* v. *United States*, 366 U.S. 213. Respondent also suggests that since petitioner has made no argument on brief as to this issue he should be considered to have conceded it. Both in his petition and on brief, petitioner has contested the inclusion of the $32,000 in his income and, although he has directed no specific argument to this issue, we do not think he should be considered to have conceded it.

At the trial petitioner testified that after he had received it some doubt arose as to his right to retain the $32,000 in question. He also testified that sometime after 1965 litigation was commenced by the

New York Central Railroad seeking the return of the $32,000 and that in 1969 a consent judgment was entered against him in the amount of $20,000. It seems from the nature of all his testimony that petitioner is trying to imply that he was uncertain as to the character of the $32,000 and did not include it in income since he was anticipating the possibility of having to restore this sum.

Based upon a consideration of the record as a whole, we think it is clear that petitioner knew all along that he never had a right to the $32,000. He received it as the result of a carefully conceived plan on his part without any consensual recognition of an obligation to repay it. Further, during 1965 he did not restore any portion of the money to its rightful owner. By his own admission, he treated the entire sum as income, depositing it in his bank account and using it to draw checks upon. It thus appears that throughout all of 1965 petitioner had the free and unrestricted use of such money.

In *James* v. *United States, supra,* the Supreme Court stated in part as follows:

The language of § 22 (a) of the 1939 Code, "gains or profits and income derived from any source whatever," and the more simplified language of § 61 (a) of the 1954 Code, "all income from whatever source derived," has been held to encompass all "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." *Commissioner* v. *Glenshaw Glass Co.,* 348 U.S. 426, 431. A gain "constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it." *Rutkin* v. *United States, supra,* at p. 137. * * *

When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, "he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." *North American Oil* v. *Burnet, supra,* at p. 424. In such case, the taxpayer has "actual command over the property taxed—the actual benefit for which the tax is paid," *Corliss* v. *Bowers, supra.* This standard brings wrongful appropriations within the broad sweep of "gross income"; it excludes loans. * * *

Accordingly, we hold that the $32,000 in question is properly includable in petitioners' income for the taxable year 1965.

The next issue for decision concerns the deductibility of the amount of $13,051.23 out of the total amount of $16,537.83 claimed for travel and entertainment expenses. Together with this we shall also consider the issue of the deductibility of the expenses of $1,914.82 claimed for petitioner's summer home and related facilities since petitioner's testimony was directed at both together and since his argument on brief treats both issues as one.

Respondent argues that petitioner has failed to establish that the expenditures in question were ordinary and necessary expenses in-

curred in carrying on his business within the meaning of section 162 of the Internal Revenue Code of 1954.[1] Respondent also argues that petitioner has failed to substantiate such expenditures as required by section 274 of the Code.[2]

It is well settled that for expenses of the type claimed to be deductible under section 162, they must be shown to have been incurred primarily for the benefit of the business carried on by the taxpayer. See *Robert Lee Henry*, 36 T.C. 879, and cases cited therein. Section 274 of the Code specifically deals with the deductibility of expenses of the type claimed. In *John L. Ashby*, 50 T.C. 409, we stated in respect to section 274:

In general, section 274 provides that to be deductible an item with respect to entertainment must be shown to be directly related to or, under specified circumstances, associated with the active conduct of the taxpayer's trade or

---

[1] Sec. 162(a) provides in part as follows:

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

\*     \*     \*     \*     \*     \*     \*

(2) traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business ; \* \* \*

[2] Sec. 274 provides in part as follows:

SEC. 274. DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC., EXPENSES.
(a) ENTERTAINMENT, AMUSEMENT, OR RECREATION.—
(1) In general.—No deduction otherwise allowable under this chapter shall be allowed for any item—
(A) ACTIVITY.—With respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, unless the taxpayer establishes that the item was directly related to, or, in the case of an item directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), that such item was associated with, the active conduct of the taxpayer's trade or business, or
(B) FACILITY.—With respect to a facility used in connection with an activity referred to in subparagraph (A), unless the taxpayer establishes that the facility was used primarily for the furtherance of the taxpayer's trade or business and that the item was directly related to the active conduct of such trade or business,
and such deduction shall in no event exceed the portion of such item directly related to, or, in the case of an item described in subparagraph (A) directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), the portion of such item associated with, the active conduct of the taxpayer's trade or business.

\*     \*     \*     \*     \*     \*     \*

(d) SUBSTANTIATION REQUIRED.—No deduction shall be allowed—
(1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home),
(2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity, \* \* \*

\*     \*     \*     \*     \*     \*     \*

unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility, or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift. \* \* \*

business, and that an item with respect to a facility used in connection with entertainment is deductible only if it is shown that the facility was used primarily for the furtherance of the taxpayer's trade or business and that the item was directly related to the active conduct of the business. Section 274 also lays down strict requirements with respect to substantiation as a prerequisite to deductibility. It provides that an item is not deductible unless the taxpayer substantiates by adequate records, or by sufficient evidence corroborating his own statement, the amount of the expense or other item, the time and place of the entertainment or use of the facility, the business purpose of the expense or item, and the business relationship to the taxpayer of the persons entertained or who used the facility. The congressional committee reports[4] show that the substantiation requirements of section 274 contemplate more detailed recordkeeping than was common prior to the time of the enactment of section 274, and that it was the intention of Congress that no deduction should be allowed solely on the basis of a taxpayer's unsupported self-serving testimony. * * * [Footnote omitted.]

We also pointed out in *William F. Sanford*, 50 T.C. 823, affd. (C.A. 2) 412 F. 2d 201, that the requirements of section 274 are in addition to those imposed by section 162, and that petitioner still has the burden of proving that the expenses are ordinary and necessary and proximately related to his trade or business.

The testimony of the petitioner was very general and conclusory. There was submitted in evidence a list containing the dates, the amounts, and payees of various checks totaling $13,051.23, which was the amount disallowed by the respondent. The checks were generally drawn to the petitioner, to cash, to various liquor or food stores, to various restaurants, and to credit-card companies. The petitioner testified in general that all the amounts were expended for business rather than personal purposes. By reference to notations which he had kept from prior years he recalled the names of several persons whom he had entertained in 1965. However, with one exception, he did not relate any particular expenditure to any person or persons entertained. In no case did he provide any other evidence corroborating his own testimony as required by the statute. He also testified that he entertained a number of people at his summer home and on his boat, and estimated that 50 percent of the use of these facilities was in connection with business purposes. Here again his testimony was similarly general and conclusory and not corroborated. The same is true with respect to travel which he stated that he made in connection with his business primarily in the New York area and occasionally for trips to Chicago and Washington, D.C.

Further, the petitioner's testimony was contradictory. At one point he testified that the greater part of his income for 1965 came from people whom he entertained. Actually, of the amount of gross receipts of $47,921.32 which was reported, $46,505.98 was attributable to com-

missions paid by Donnelly Bros. for New York Central business and only $1,415.34 was attributable to commissions from other sources. Upon cross-examination petitioner admitted that the questioned expenditures were not in the main attributable to securing the New York Central Railroad business for Donnelly Bros. but to entertain prospective clients to enable him to earn commissions in the future.

Upon the record we must conclude that the petitioner has failed to establish that any amount expended for travel and entertainment in excess of the amount of $3,486.60 allowed by the respondent or that any amount expended in connection with his summer home constituted ordinary and necessary business expenses incurred under section 162 of the Code. Furthermore, the record falls woefully short of meeting the substantiation requirements of section 274(d) of the Code.

We accordingly approve the respondent's determination with respect to the deductibility of amounts claimed for travel and entertainment and with respect to amounts expended in connection with petitioner's summer home and boat.

The next issue presented for decision is whether petitioner's failure to file the return for the taxable year 1965 within the time prescribed by law was due to reasonable cause within the meaning of section 6651(a).[3] On brief petitioner argues that he relied upon his accountant to prepare and file his return, that he was led to believe by his accountant that an extension of time for the filing of his return had been granted, and that the return had been filed within the time of such extension. Thus, it seems that the petitioner appears to be contending that his reliance upon his accountant's assurances constitutes reasonable cause, under the circumstances, for his own failure to timely file the return. The petitioner's testimony in this regard is quite confusing and contradictory. At one point he indicated that he did not know that an application for an extension of time had been filed, and that he was under the impression that his accountant had timely filed a tentative return on the basis of incomplete information and that an amended return would be filed. At another point, he acknowledged that he had signed the application for an extension of time and indi-

---

[3] Sec. 6651(a) provides as follows:
(a) ADDITION TO THE TAX.—In case of failure—
(1) to file any return required under authority of subchapter A of chapter 61 (other than part III thereof), subchapter A of chapter 51 (relating to distilled spirits, wines, and beer), or of subchapter A of chapter 52 (relating to tobacco, cigars, cigarettes, and cigarette papers and tubes), or of subchapter A of chapter 53 (relating to machine guns and certain other firearms), on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate;

cated that he had discussed this with his accountant. At no point did petitioner testify that he was under the impression that the extension had been granted and that his return was filed during the period of the extension. After a careful consideration of the entire record, we are unable to conclude that petitioner has proven the facts upon which he bases his argument. Moreover, it is well established that an accountant's failure to prepare and file a return does not itself constitute reasonable cause for failure to file within the meaning of section 6651(a). See *Logan Lumber Co.* v. *Commissioner* (C.A. 5), 365 F. 2d 846, and cases cited therein. Accordingly, we approve respondent's assertion of the 25-percent addition to tax under section 6651(a).

The final issue for decision in this case is whether any part of the underpayment of tax was due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a).[4] The burden of proof with respect to this issue is on petitioner. See *Marcello* v. *Commissioner*, (C.A. 5) 380 F. 2d 499.

On brief petitioner argues that he had concluded that the $32,000 in question did not constitute income for the taxable year 1965 because of his belief that he was, in effect, holding the money in trust, to be ultimately returned in accordance with the litigation pending against him. He continues that at best he was confused, but in any event the circumstances do not establish negligence or intentional disregard of rules and regulations.

At trial, petitioner testified that when his accountant was compiling his return for 1965 there was some question as to including the $32,000 in income and that some legal research had to be done. There is no evidence as to what, if any, legal advice petitioner received. On the other hand, the record clearly establishes that petitioner received the money in 1965 without any consensual recognition of an obligation to repay and treated it as income during the entire year. Any confusion which may have arisen on petitioner's part arose after the close of the taxable year. Petitioner has offered no evidence as to why he did not report the money as income for 1965, the year in which he received it and so treated it, and then take a deduction on a subsequent year's return when he restored it. See *North American Oil Consolidated* v. *Burnet, supra.* Thus, petitioner's confusion would at best seem to be indifference to the proper tax treatment of the amount in question.

---

[4] Sec. 6653(a) provides as follows:

(a) NEGLIGENCE OR INTENTIONAL DISREGARD OF RULES AND REGULATIONS WITH RESPECT TO INCOME OR GIFT TAXES.—If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.

In view of the record as a whole, we have concluded that petitioner has failed to show that no part of the underpayment was due to negligence or intentional disregard of rules and regulations. Accordingly, we approve respondent's assertion of the 5-percent addition to tax under section 6653(a).

*Decision will be entered for the respondent.*