JAMES J. FREELAND AND MAXINE FREELAND, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Freeland v. Commissioner
Docket No. 18708-82.
United States Tax Court
T.C. Memo 1986-10; 1986 Tax Ct. Memo LEXIS 598; 51 T.C.M. (CCH) 253; T.C.M. (RIA) 86010; January 9, 1986. W. Gerald Thornton and David D. Dahl, for the petitioners. Edwina L. Wilson, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined that deficiencies in income tax and additions to tax are *599 due from petitioners for the years 1977 and 1978 as set forth below: Additions to Tax
Year
Deficiency
Sec. 6651(a)(1) [1]
Sec. 6653(a)(1)
1977
$17,378.14
$6,287.47
$1,307.49
1978
3,293.62
164.68
Due to concessions, the issues remaining for decision are: (1) whether certain litigation expenses incurred by petitioners in the defense of a foreclosure action constitute deductibel expenses or nondeductible capital expenditures; (2) whether litigation expenses incurred by petitioners in a separate corollary action in which they were named defendants and counter claimed for damages for slander of title constitute deductible expenses or nondeductible capital expenditures; (3) whether petitioners' failure to timely file their 1977 return was due to reasonable cause within the meaning of section 6651(a)(1); and (4) whether the underpayment, if any, in petitioners' income tax for 1977 or 1978 is due to negligence *600 or intentional disregard of rules and regulations under section 6653(a)(1). [2]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations and exhibits attached thereto are incorporated herein. At the time their petition was filed, petitioners resided in Hillsborough, North Carolina. They filed joint income tax returns for the years 1977 and 1978 with the Internal Revenue Service Center at Memphis, Tennessee. In 1941, petitioner, James J. Freeland, whose education ended in the sixth grade, started constructing houses and commercial buildings such as restaurants and motels. Some of his construction was done under contracts with other parties while some of it was done on land owned by petitioners.He continued to do such construction *601 up through 1977 and 1978, the years under consideration. In 1964 he and Mrs. Freeland bought a tract of land containing 83 acres at an exit from Interstate 85 near Hillsborough. At that time, the tract was improved with three barns and an old house. Starting in 1965 and continuing through 1971, Mr. Freeland remodeled the barns and the house and personally constructed other buildings and improvements until the tract contained a motel, a campground, an amusement park, a restaurant, several stores and shops, a skating rink and other businesses, all of which were known as the Daniel Bonne Complex ("DBC"). Petitioners operated the motel and skating rink. The other businesses were operated by other parties under leases from petitioners. All of the improvements were of a primitive nature, since they were constructed from old wooden materials salvaged by Mr. Freeland from the demolition of other buildings. The construction stopped about the end of 1971 because of the bad health of both petitioners and they decided at that time to sell the complex. On May 2, 1972, petitioners entered into a contract to sell the DBC to Matthew N. and Genevieve D. Mezzanotte ("Mezzanottes") or their *602 assignees. Shortly after entering into the purchase and sale agreement, the Mezzanottes assigned their rights therein to Daniel Boone Complex, Inc. ("DBC, Inc."), a new North Carolina corporation which they had organized. The Mezzanottes then sold all of the outstanding stock in DBC, Inc. to Camilco, Inc. ("Camilco"). All of Camilco's stock was owned by Linda Broyhill McGillan, who permitted DBC, Inc. to remain as a wholly owned subsidiary of Camilco. Under the original contract, the purchase and sale of DBC was to have occurred in 1972, but for several different reasons the sale was delayed until 1974. One of the reasons for the delay was a lawsuit instituted by the Mezzanottes and DBC, Inc. against petitioners in the Superior Court of North Carolina for specific performance on the contract of sale plus damages for the breach thereof. The Superior Court found for the plaintiffs and ordered petitioners to convey DBC to the purchasers in accordance with the sale contract and to pay them damages in the amount of $100,000. The decision of the Superior Court was affirmed by the North Carolina Court of Appeals and in January of 1974 the North Carolina Supreme Court declined to grant *603 certiorari. Mezzanotte v. Freeland,20 N.C.App. 11, 200 S.E.2d 410 (1973), cert. denied 284 N.C. 616, 201 S.E.2d 689 (1974). By deed dated March 1, 1974, and recorded on March 15, 1974, petitioners conveyed DBC to DBC, Inc. At the closing of the sale, petitioners received $200,000 in cash and a promissory note for the balance of the purchase price of $1,085,000. The note was payable in 20 annual installments, commencing on March 1, 1975 and bore interest at the rate of 7 percent per annum, payable annually. The promissory note was secured by a deed of trust on the DBC land, buildings, and other improvements. It was also secured by a chattel mortgage on the furniture, fixtures and other personal property of DBC. Since the buildings and other improvements of DBC were particularly subject to destruction by fire, petitioners caused the following provision to be inserted in the deed of trust: That the said party of the first part [DBC, Inc.] will insure and keep insured the buildings and contents on the premises herein conveyed against loss by fire and wind-storm during the existence of this indebtedness in an amount satisfactory to the holder *604 of the Note [petitioners] not to exceed the unpaid balance thereon and will assign said insurance to the holder of the Note as his interest may appear for the security of any and all amounts which may be due him; and, should the party of the first part fail to cause such insurance to be issued and assigned as aforesaid or fail to pay any premium therefore, then the said holder of the Note is authorized to effect such insurance or to make such premium payments as may be due, if he so elects, and such sums so paid shall be a lien against the said premises and immediately due and payable to the holder of the Note and shall be secured hereby to the same extent as the principal amount herein described. The purpose of the above insurance was to protect the security for the note taken by petitioners as part of the purchase price. However, DBC, Inc. failed to furnish petitioners at the closing with evidence of the insurance as required under the deed of trust. Consequently, after the closing of the purchase and sale, petitioners obtained the necessary fire and casualty insurance on the DBC property at a cost of $27,005 and demanded reimbursement for the cost of the insurance from DBC, *605 Inc. Subsequent to the closing, petitioners also became aware of the fact that DBC, Inc. had purchased certain building materials, supplies, and construction services on credit, had failed or refused to pay for the same, and had permitted liens to be filed against DBC, Inc. and its property, including DBC. During May, June, and part of July of 1974 petitioners through their attorney, Dalton Hartwell Loftin, who was also the trustee under the deed of trust, made several attempts to obtain reimbursement for the insurance from DBC, Inc. The attempts included letters to the effect that unless the terms of the deed of trust with respect to insurance were complied with foreclosure would be undertaken even though at that time there was no interest or principal due on the note. By letter dated July 2, 1974 DBC, Inc. was informed by petitioner's attorney that DBC, Inc. was in default under the deed of trust and the chattel mortgage because of its failure to reimburse petitioners for the cost of the insurance. On July 22, 1974 petitioners exercised their option to accelerate the total debt secured by the deed of trust and the chattel mortgage and, at their request, the trustee gave notice *606 of sale of the realty pursuant to the deed of trust and of the personalty pursuant to the chattel mortgage. This action was recommended to petitioners by their counsel because of the failure of DBC, Inc. to make any response to his demands for reimbursement of the insurance premium and because in his opinion foreclosure was necessary in order to clear the property of the liens filed by creditors of DBC, Inc. The foreclosure sale was originally scheduled for August 23, 1974, but on August 21, 1974, DBC, Inc. and others filed a complaint against petitioners and the trustee under the deed of trust in the Superior Court in which they sought both temporary and permanent injunctive relief from the pending foreclosure sale. Plaintiffs in the lawsuit were granted a temporary restraining order, but on August 28, 1974 the restraining order was dissolved and the foreclosure occurred on August 30, 1974. At the sale, petitioners made the highest bids for the real property under the deed of trust and the personal property under the chattel mortgage. After the foreclosure, sale, DBC, Inc. and the other plaintiffs amended their complaint so as to seek to have the foreclosure set aside with an *607 award for damages for the interim loss of profits or, in the alternative, an award for damages for the loss of the property. At the trial, the plaintiffs elected to seek damages only and abandoned their attempt to recover DBC. On July 11, 1975, the Superior Court granted a motion by plaintiffs for partial summary judgment to the effect that the deed of trust and chattel mortgage had been wrongfully foreclosed. On appeal by petitioners, the North Carolina Court of Appeals reversed the partial summary judgment and remanded the matter to the Superior Court for further proceedings. On August 19, 1977, a decision was entered by the Superior Court in which it was held that the foreclosure was valid and that the plaintiffs were not entitled to any damages from petitioners. The plaintiffs appealed the decision to the Court of Appeals but while the appeal was pending petitioners, on December 24, 1977, paid $11,000 to the plaintiffs in full settlement of the matter. At the same time that DBC, Inc. joined in the wrongful foreclosure proceeding against petitioners, DBC, Inc. also joined in a separate corollary action in the Superior Court of Orange County, North Carolina. In this action, *608 petitioners counterclaimed for damages for slander of their title to the DBC property. This action was dismissed on August 12, 1977. [3]
In connection with the two suits, petitioners incurred and paid litigation expenses in the years 1977 and 1978 in the respective total amounts of $34,650.00 and $11,316.44. The 1977 expenditures consisted of $20,200.00 in attorney fees, the $11,000.00 in settlement of the foreclosure suit, and $3,450.00 in witness fees in the same suit. The 1978 expenditure of $11,316.44 consisted entirely of attorney fees. An exact allocation of the attorney fees as between the foreclosure action and the corollary matter cannot be made from the record. The parties, however, stipulated that only a "minor portion" of the total in attorney fees was incurred in connection with the corollary action. For 35 years prior to 1977, petitioners' income tax returns were prepared by R. C. Neighbors, an accountant, from information furnished by petitioners. Their information for the 1977 return was also turned over to Mr. Neighbors and at his request respondent granted *609 an extension of time until June 15, 1978, in which to file the 1977 income tax return. No further extensions were requested. The 1977 return of petitioners was filed on January 25, 1979. OPINION Litigation Expenses
Petitioners contend that all of the legal fees, witness expenses and settlement costs incurred in the wrongful foreclosure action as well as the corollary matter are ordinary and necessary expenses incurred by them in an effort to collect, or protect the ultimate collection, of the interest bearing (income producing) note which they received in the sale of DBC and are deductible under section 212(1) and (2). [4]
Respondent's first contention is that the legal fees, witness expenses and settlement costs were incurred by petitioners in the defense or *610 perfection of title to DBC and are nondeductibel capital expenditures under section 263(a). [5]Spangler v. Commissioner,323 F.2d 913, 919 (9th Cir. 1963), affg. T.C. Memo. 1961-341; sections 1.263(a)-2(c) and 1.212-1(k), Income Tax Regs. Secondly, respondent argues that the litigation expenses should be capitalized because the origin of the litigation was in the original sale of a capital asset. Reed v. Commissioner,55 T.C. 32 (1970); Anchor Coupling Company, Inc. v. United States,427 F.2d 429, 433 (7th Cir. 1970), cert. denied 401 U.S. 908 (1971). In determining whether legal fees and other litigation expenses are deductible under section 212 or must be capitalized under section 263(a) the origin of the litigation is the controlling test; and under this test, if the claim has its origin in the acquisition of a capital asset, no ordinary expense deduction *611 is allowable. Woodward v. United States,397 U.S. 572 (1970); United States v. Hilton Hotels,397 U.S. 580 (1970). In determining whether the underlying transaction is capital in nature, the search for the origin of the claim is not limited to a simple determination of the first event in a chain which led to the litigation but, instead is "an examination of all the facts * * * to [ascertain] the 'kind of transaction' out of which the litigation arose." Boagni v. Commissioner,59 T.C. 708, 713 (1973). In other words, the test includes a consideration of "the nature and objectives of the litigation, the defenses asserted, the purpose for which the claimed deductions were expended, the background of the litigation, and all facts pertaining to the controversy." Boagni v. Commissioner,59 T.C. at 713. Examination of all the facts pertaining to the controversy involved in this case clearly indicates that the wrongful foreclosure action was filed against petitioners by DBC, Inc. after and in direct response to petitioners' declaration of a default on the note, their exercise of the option to accelerate the installment *612 payments, and their initiation of foreclosure proceedings. Consequently, all fees and other litigation expenses incurred by petitioners in connection with the issuance of the temporary restraining order, its dissolution by the trial court, the subsequent trial, the appeal and its subsequent settlement were all directly attributable to the foreclosure proceedings. It is apparent, therefore, that in this case the "kind of transaction out of which the litigation arose" was a foreclosure action of which the "nature", "objective" and "purpose" was to remove the title to DBC from DBC, Inc. Since petitioners were the successful bidders at the foreclosure sale, the end result of the transaction was a reacquisition of the title to DBC by petitioners. Therefore, all of their litigation expenses are attributable to the reacquisition of title and are not deductible under section 263(a). Petitioners contend, however, that the foreclosure was instituted solely to collect their note, an income producing asset, and that fees and other expenses incurred in connection with such collection activity even on a note or other evidence of debt received in the sale of a capital asset is deductible under *613 Doering v. Commissioner,39 T.C. 647 (1963), affd. 335 F.2d 738 (2d Cir. 1964), and Naylor v. Commissioner,203 F.2d 346 (5th Cir. 1953), revg. 17 T.C. 959 (1951). Their reliance in this case on those opinions is misplaced, however, because in both Doering v. Commissioner,supra, and Naylor v. Commissioner,supra, the litigation in which the disputed expenses were incurred did not result in the acquisition of title by the taxpayers. Here, the end result of the transaction was the acquisition of title. Consequently, all expenses incurred in connection with the transaction are reflected in the cost of the asset or assets acquired. We see no reason why this result would be affected by the fact that at the beginning of the foreclosure petitioners may not have intended to acquire title but only to collect their note. Their motive or purpose at that time is not controlling. Yates Industries, Inc. v. Commissioner,58 T.C. 961 (1972). Neither party has devoted much discussion to the portion of the attorney fees paid by petitioners with respect to the second suit *614 in the Superior Court. They did stipulate that it was a "corollary action" to the wrongful foreclosure suit and that only a "minor part" of the total in attorney fees was attributable to it. In any event, we note that petitioners' counterclaim was for slander of title which clearly leads to an inference that their defense to the suit was based upon a claim of title. Consequently, the deduction of this portion of the attorney fees is not allowable because expenditures to defend title or to assert slander of title are also capital in nature. Spangler v. Commissioner,323 F.2d 913 (9th Cir. 1963), affg. T.C. Memo. 1961-341. Failure to File Timely Return
Respondent determined that petitioners are liable for the addition to tax provided by section 6651(a)(1) for failing to timely file their 1977 income tax return. Petitioners contend that they are not liable for the addition to tax because they relied in good faith upon their accountant of 35 years to make a timely filing on their behalf with the information which they had provided. Unfortunately for them, the Supreme Court has recently held that the failure to make "a timely filing of a tax return *615 is not excused by the taxpayer's reliance on an agent, and such reliance is not 'reasonable cause' for a late filing under section 6651(a)(1)." United States v. Boyle, 469 U.S.     (1985). Since petitioners' reliance upon the accountant is their sole defense to the addition to tax under section 6651(a)(1), they have failed to overcome the presumption that respondent's determination with respect to the addition is correct. Therefore, respondent's determination with respect to the addition under section 6651(a)(1) is sustained. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Negligence
In the statutory notice, respondent determined that the deficiencies in tax due from petitioners for 1977 and 1978 were due to their negligence or intentional disregard of rules and regulations. Petitioners have the burden of proving this determination to be incorrect. Pritchett v. Commissioner,63 T.C. 149 (1974); Bradley v. Commissioner,57 T.C. 1 (1971). Respondent contends that petitioners' deduction of the litigation expenses constitutes negligence under section 6653(a) because such expenses clearly constituted "nondeductibel *616 capital expenditures." Under the circumstances outlined in our findings, we are unable to agree with respondent inasmuch as this particular question has been the subject of a great deal of litigation over a number of years and both lawyers and accountants who are thoroughly familiar with the subject and the numerous cases on the point frequently disagree as to whether an item constitutes a deductible expense or a capital expenditure. Therefore, we are unable to find that the deduction in this case by petitioners constituted negligence or the intentional disregard of rules and regulations. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise provided.↩
2. Petitioners have assigned error to respondent's allowance of additional depreciation deductions in 1977 and 1978 and an additional sales tax deduction in 1977. These adjustments arise from respondent's determination that the litigation expenses in issue must be capitalized instead of expensed. Consequently, the depreciation and sales tax adjustment issues will be resolved by the outcome of the first two issues.↩
3. While the record is unclear, the action was apparently dismissed by agreement of the parties.↩
4. Section 212 provides: In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year-- (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income; or (3) in connection with the determination, collection, or refund of any tax.↩
5. Section 263(a) provides in relevant part: (a) GENERAL RULE.--No deduction shall be allowed for-- (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. * * *↩