BERKLEY MACHINE WORKS & FOUNDRY COMPANY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Berkley Machine Works & Foundry Co. v. Commissioner
Docket Nos. 967-72 1248-73
United States Tax Court
T.C. Memo 1977-177; 1977 Tax Ct. Memo LEXIS 259; 36 T.C.M. (CCH) 733; T.C.M. (RIA) 770177; June 13, 1977, Filed *259 Petitioner owned and maintained three buildings on Ocracoke Island, North Carolina, which it used as hunting and fishing lodges, for the entertainment of employees of its major customers during 1963 through 1967. Held, the major portion of petitioner's entertainment activity and facility expenses were directly related to the active conduct of its business and substantiated as required by section 274(a) and (d), I.R.C. 1954. Petitioner is entitled, consequently, to deductions for depreciation and ordinary and necessary business expenses as determined. Held further, respondent erroneously disallowed an investment credit claimed by petitioner with respect to an airplane purchased by it in 1967. Held further, repair expense or capital nature of certain payments with respect to manufacturing equipment used at petitioner's plant determined. Ellsworth T. Simpson, for the petitioner. Nancy Mattox McMurrer, for the respondent. BRUCE MEMORANDUM FINDINGS OF FACT AND OPINION BRUCE, Judge: Respondent determined deficiencies in petitioner's Federal corporate income taxes as follows: Docket No.
Year
Deficiency
1248-73
1963
$16,849.45
1964
22,193.27
967-72
1965
48,339.78
1966
63,518.31
1967
62,956.39
The *260 cases have been consolidated for trial, briefing, and opinion pursuant to a joint motion of the parties. Each party has made certain concessions regarding the deficiencies that we are to redetermine. The following issues remain for our resolution: (1) Whether certain deductions claimed by petitioner in connection with an entertainment facility maintained and activities conducted at Ocracoke Island, North Carolina, are allowable as ordinary and necessary business expenses in 1963 through 1967, inclusive; (2) Whether petitioner is entitled to an investment credit with respect to an airplane purchased by it in 1967; (3) Whether certain payments made by petitioner in connection with its equipment in 1965 and 1966 constitute currently deductible repairs expenses or capital expenditures subject to an allowance for depreciation. FINDINGS OF FACT Some of the facts have been stipulated by the parties and they are so found. Unless otherwise noted the following facts are of general applicability to all the years involved in this proceeding. The petitioner, Berkley Machine Works & Foundry Company, Inc., was incorporated in 1914 under the laws of the Commonwealth of Virginia. It maintains *261 its principal offices in Norfolk, Virginia, where its plant is also located. Petitioner timely filed its corporate income tax returns for the calendar years 1963 through 1967, utilizing the accrual method of accounting, with the district director of internal revenue at Richmond, Virginia. Samuel G. Jones, Sr., has been petitioner's president since 1919, and during 1963 through 1967 he owned 83 percent of its capital stock. During the relevant years, Samuel G. Jones, Jr., was petitioner's vice-president and he owned the remaining 17 percent of its capital stock. Petitioner's business involved the operation of a foundry for iron, steel, brass, and aluminum, including a pattern shop and a machine shop, and the manufacture of metal castings and forgings. Berkley manufactured both parts which other companies used in their production of a finished product and repair parts for equipment used by other companies in their production process. Patterns for parts that petitioner manufactured were provided either by existing plans and specifications or by using old parts as a sample. Petitioner's ability to acquire a particular job of manufacturing equipment repair parts was often dependent *262 upon its ability to produce them more quickly and less expensively than the original equipment manufacturer. Because of the nature of petitioner's business, media advertising was of limited usefulness. The company's policy for promoting sales was that of developing and maintaining personal contact with the appropriate personnel of its customers - individuals often in various departments of the same company. Berkley's principal sales efforts were directed toward a small number of major customers, identified by name on the following chart depicting petitioner's sales: TABLE 1 BERKLEY MACHINE WORKS & FOUNDRY CO., INC., SALES ANALYSIS CUSTOMER
1963
1964
1965
Albemarle Paper Company
$ 57.60
$ 2,289.25
$ 7,465.34
American Oil Company
3,959.30
9,600.47
25,097.03
Atkinson Dredging Company
29,253.82
21,787.14
10,323.40
Bowen-McLaughlin-York
290,679.39
5,249.89
82,557.18
Drill Carrier Corporation
699,098.21
931,574.18
845,669.38
Franklin Equipment Company
65,059.80
250,764.24
Pennsylvania RR (Penn Central)
74,223.87
67,973.22
128,164.62
Texas Gulf Sulphur Company
Union Bag-Camp Corporation
12,081.83
39,247.42
24,949.27
Weyerhaeuser Corporation
6,050.00
27,408.98
13,058.36
All Other Customers
397,684.47
305,051.75
340,002.12
(Approximately 150)
TOTALS
$1,513,088.49
$1,475,242.10
$1,728,050.94
CUSTOMER
1966
1967
Albemarle Paper Company
$ 21,135.77
$ 18,650.93
American Oil Company
49,230.52
50,034.20
Atkinson Dredging Company
22,028.40
9,589.55
Bowen-McLaughlin-York
174,073.31
329,481.30
Drill Carrier Corporation
841,019.94
749,561.37
Franklin Equipment Company
356,205.65
258,701.31
Pennsylvania RR (Penn Central)
171,991.36
139,839.21
Texas Gulf Sulphur Company
11,075.40
Union Bag-Camp Corporation
30,575.06
27,989.64
Weyerhaeuser Corporation
33,706.43
103,233.17
All Other Customers
289,787.62
294,523.15
(Approximately 150)
TOTALS
$1,989,754.06
$1,992,679.23
*263 Petitioner's contact with these customers, the frequency of which varied from as often as three or four times a day to as seldom as once a week, was maintained primarily through two sales representatives. E. M. Weber concentrated his activities in the area around York, Pennsylvania, where Pennsylvania Railroad and Bowen-McLaughlin-York were located. From the Norfolk office, C. M. Halsey directed the sales effort toward local customers and customers located in other southeastern states. However, petitioner's largest customer, Drill Carrier Corporation, was serviced by Samuel G. Jones, Jr., and F. P. Huber, the foundry superintendent. [1]
One of the means by which petitioner cemented its relationship with its customers was by use of an entertainment facility owned and maintained by it on Ocracoke Island. Ocracoke is an island off the Atlantic Coast of North Carolina, just south of Hatteras. It is an isolated island consisting of a small cluster of homes at one *264 end and a succession of sand dunes and marshes leading to the other end. There is no bridge leading from the mainland to the island, a ferry being the only means of public transportation to Ocracoke. Petitioner's Ocracoke facility consisted of three buildings of wood frame construction, the exteriors of which were covered with fir shingles. Each building was designed as a home, with a living room, a dining room, and several bedrooms. The interiors were nicely furnished to reflect the tastes of Jones, Sr. On the second floor of Berkley Castle, the largest of the three buildings, was a conference room containing a drafting board, a large table, and a number of chairs. Known as Berkley Castle, Berkley Manor, and Berkley Ranch House, the three buildings were used as hunting and fishing lodges. During 1963 through 1967, employees from all of petitioner's major customers (except Texas Gulf Sulphur) and from a few of its smaller customers were invited by petitioner's officers and sales representatives to visit the Ocracoke facility for hunting and/or fishing trips. On occasion petitioner's business associates would be accompanied by members of their families, or other guests having *265 no direct business relationship with petitioner. The number of guests present at a single time varied between about 6 and 30, the general number approaching the arithmetical mean of these extremes. Guests typically received, as momentos of their Ocracoke visit, gifts distributed by petitioner such as hunting and fishing knives, model ducks to be used as doorstops, cookbooks or other books, and neckties with a Berkley label. Petitioner's Ocracoke facility was used throughout the year, but primarily on weekends from late spring through early fall. However, guests were not invited each and every week even during this period. A typical fishing trip to Ocracoke began on Thursday afternoon or Friday morning. After breakfast on Friday, the fishermen split into teams of four, five, or six and fished until lunchtime from boats chartered by petitioner from various individuals who were engaged in the business of taking out fishing parties off the coast of North Carolina. The fishermen returned to Berkley's facility for lunch, and then resumed fishing for the remainder of the afternoon. Saturday's activities duplicated those of Friday. Guests generally left the island after breakfast *266 on Sunday. The Ocracoke setting established a congenial and relaxing atmosphere in which petitioner's sales representatives pursued petitioner's business interests, i.e. promoting sales. Business discussions often centered around specific jobs that Berkley was in the process of performing for its customer-guests. At other times determinations were made whether Berkley could perform specific jobs which the customer-guests needed done. On occasion petitioner's guests would initiate discussions about problems that arose only a few days prior to their trip to Ocracoke, after the visit had been planned. The conference room in Berkley Castle was used when examination of plans and specifications was pertinent. Discussions of anticipated business needs and job scheduling were conducted in even less formal surroundings, e.g. on the fishing boats, during meals, and while relaxing after dinner. In composing the parties to be invited to Ocracoke on a particular occasion, Berkley's representatives sometimes included employees from several different customer-companies. By so mixing its guests, petitioner was able to make certain customers aware of the work that it was performing for others *267 - the underlying purpose of which was to inform each company of the different and additional types of work that petitioner could do for it. Business guests visiting Ocracoke believed the trips there to be meaningful and beneficial to both their employers and to Berkley because of the actual substantive matters discussed and resolved and also because of the information they received about various other functions that Berkley could perform for them. In addition to Berkley's Ocracoke facility, petitioner's president and major stockholder, Samuel G. Jones, Sr., owned and maintained a vacation home elsewhere on the island.Although it was usual for Jones, Sr., to attend the Berkley facility while guests were being entertained, he did not participate in the hunting or fishing and he returned to his personal residence in the evenings. [2] *268 Petitioner's Ocracoke facility was not used by Jones, Sr., members of his family or other Berkley employees for entertainment unrelated to the advancement of Berkley's business. Respondent has conceded that the Ocracoke facility was used primarily for the furtherance of petitioner's trade or business. Petitioner employed a caretaker to oversee the operation of its Ocracoke facility. The caretaker was responsible for preparation of the facility for use by petitioner's representatives and guests, which, when appropriate, included chartering the required number of fishing boats. Other islanders were hired to do cleaning, laundering, and the cooking and serving of meals at the facility.The caretaker collected bills for the various expenses incurred on the island, e.g. boat charter fees, restaurant meals, and groceries, and forwarded them to petitioner's Norfolk office for payment. Most of the expenditures in connection with petitioner's Ocracoke facility and entertainment activities (other than payroll and capital expenditures) were charged to two expense accounts: promotional sales and Berkley Manor supplies. [3] The cash receipts and disbursements journals and general expense ledgers in which these *269 accounts were maintained were kept in the regular course of petitioner's business and conformed to generally accepted accounting principles. In addition to the corporate books, which contain the date of each expenditure, petitioner retained the complementary invoices, receipts, and petty cash vouchers and reimbursement sheets which support the book entries for these accounts. Many of the cash journal entries and related documents contain a notation of the Ocracoke guests to whom the expenditures relate. Other documents, supporting expenditures for quantities of items to be used over the course of several Ocracoke visits, do not contain the names of particular guests. The total amounts disallowed by respondent and remaining in dispute in connection with petitioner's entertainment activities and facility at Ocracoke are set forth below in Table 2: TABLE 2
1963
1964
Expenditures
$ 7,389.01
$ 4,133.29
Depreciation
23,096.60
30,469.58
$ 30,485.61
$ 34,602.87
1965
1966
1967
"Promotional Sales,"
"Supplies"
$ 10,164.88
$ 21,967.66
$ 24,738.20
Miscellaneous
795.97
915.02
2,230.20
Gas & Oil
205.26
Utilities
533.00
117.43
Repairs
1,334.85
8,109.69
9,758.07
Payroll
14,559.80
30,248.01
24,687.40
N.C. Unemployment
Tax (Ocracoke)
525.69
1,972.17
1,316.21
FICA Tax
515.03
1,130.52
979.76
Employee Benefits
294.80
Insurance
884.00
1,569.56
943.00
Airplane Expense
5,762.05
Loss on Boat Sale
7,440.17
Depreciation
30,151.18
34,681.76
45,230.37
$ 59,669.66
$106,473.87
$117,618.18
Employee meeting [4]
(1,666.49)
$ 59,669.66
$106,473.87
$115,951.69
*270 Neither the amounts of the expenditures nor the cost bases, useful lives, and salvage values assigned by petitioner to the assets on which depreciation was claimed are in dispute. Inasmuch as petitioner maintained no separate diary or account book relating exclusively to its Ocracoke entertainment, the documented information pertinent to this litigation has had to be gathered piecemeal from the corporate books and supporting data. These show that petitioner's Ocracoke facility was used on the following number of occasions during the years in issue: TABLE 3
Year
Times Used
1963
13
1964
9
1965
17
1966
18
1967
19
With the exception of one use in each of the years 1963, 1965, 1966, and 1967, to be discussed below, each use involved entertainment of employees of petitioner's customers of the type heretofore described. [5] *271 In 1963 at the request of the Ocracoke Civic Club (an island organization similar to a chamber of commerce), petitioner allowed one of the club members and two representatives of the Interior Department of the Federal government to stay at its Ocracoke facility. The individuals were examining the possibility of increased ferry service to Ocracoke and the possible establishment of an airport on the island. In 1965 petitioner hosted a party for a local public figure, Lindsay Warren, at its Ocracoke facility. In 1966 petitioner allowed one of its customers, Union Camp Corporation, to hold an internal sales meeting at its Ocracoke facility. Although Jones, Sr., and Halsey sat in on the meeting, this use differed in character from the regularly conducted entertainment activities at Ocracoke. In 1967 petitioner entertained some North Carolina legislators at the same time representatives of Atkinson Dredging Company attended its Ocracoke facility. Berkley's expenditures directly connected with these four uses of its Ocracoke facility are set out in the following table: TABLE 4
Check
Year
Entertainee
Amount
Number
1963
Beasley
$ 50.00
34051
85.00
34183
1965
Warren
80.00
40507
60.40
40523
15.00
40538
1966
Union Camp
25.53
43180
(internal sales meeting)
18.63
43179
10.00
43092
191.61
43091
179.20
43223
1967
N.C. legislators &
294.33
47508
Atkinson Dredging Co.
18.54
47446
18.20
47468
90.00
47506
27.63
47512
4.84
47511
36.00
47438
5.01
47613
30.00
47496
*272 Although the business motivation for each of these uses is apparent, petitioner has failed to demonstrate that the expenses attributable thereto were incurred in the active conduct of its business. The entries in Table 5 below represent amounts that respondent argues on brief were not ordinary and necessary business expenses: TABLE 5
Year
Amount
1963
$ 529.53
1964
371.00
1965
356.66
1966
5,710.33
1967
2,434.74
These expenses relate to sundry items recorded in petitioner's promotional sales and Berkley Manor supplies accounts, but in large part to expenditures for photographic services and supplies, waitress costumes, the Beasley and Warren visits in 1963 and 1965, respectively, and gifts distributed at Ocracoke. The expenditures for gifts are further set forth in the following table: TABLE 6
Year
Amount
Check Number
1963
$ 49.50
33025
1965
105.85
40407
1966
92.87
42597
255.60
44100
1,954.50
44100
49.05
43550
1967
8.00
46806
10.00
47095
40.00
47580
50.00
47356
289.32
48512
20.00
47510
153.84
47679
The entries in Table 7 below represent amounts recorded in petitioner's promotional sales account which petitioner maintains were unrelated to its Ocracoke entertainment and, consequently, erroneously disallowed by respondent: TABLE *273 7
Year
Amount
1963
$287.64
1967
23.23
With the exception of a $9.06 expenditure for photographic supplies in 1963, the amounts contained in Tables 5 and 7 relate to different expenditures.The remaining expenditures represented by the 1963 entry were for items, largely foodstuffs, of the type generally used at Ocracoke. The 1967 entry represents the cost of a restaurant meal for the Ocracoke caretaker and eight other Ocracoke employees. Included in the total depreciation disallowed by respondent for 1967 is $1,441.46 claimed by petitioner with respect to an airplane purchased by it at a cost of $86,487.90 in that year. Also disallowed was an investment credit of $6,054.14 claimed by petitioner with respect to the airplane. Both items were disallowed based on respondent's determination that the airplane was purchased for use in connection with petitioner's Ocracoke entertainment activities. Expenditures on Machinery
In 1965 petitioner incurred expenses of $7,906.88 in connection with a model 4-A Warner & Swasey turret lathe owned and operated by it at its Norfolk plant. A turret lathe is a high production piece of equipment used in the manufacture of metal parts to cut them within required *274 tolerances. The machine in question was very large and in order to disassemble some of its components the use of overhead cranes was necessary. The turret lathe was removed to the plant of Precision Rebuilding Corporation where that company performed the work necessary to return the machine to the accuracy required for Berkley's use. Included in the total expenditure, all of which was claimed by petitioner as an ordinary and necessary business expense, was $736.29 which represented the cost of a modification to permit the turret lathe to use tools that it could not use before. Precision Rebuilding Corporation performed two different services for its customers: rebuilding of machines and maintenance of machines for smaller companies, like Berkley, which did not have their own maintenance crews. Rebuilding Berkley's turret lathe would have cost between $24,000 and $25,000. The service that was performed, however, with the exception of the $736.29 expenditure, merely kept Berkley's machine in efficient operating condition without adding to its value or appreciably prolonging its useful life. In 1966 petitioner incurred expenses of $13,661.84 for parts in connection with a wheelabrator *275 machine located at its Norfolk plant. A wheelabrator machine is used for the blast cleaning of castings after they have been shaken out of a mold. It operates by throwing steel shot or steel grit media at the castings from a wheel at high velocities. By the nature of the work it performs, a wheelabretor is a somewhat self-destructive machine and it requires the replacement of liners and various component parts to stay in efficient operating condition. The parts purchased by Berkley were such necessary parts. They did not materially increase the value of the machine or extend its useful life. Also in 1966, petitioner incurred expenses of $6,826.00 with respect to a lectromelt furnace used in its Norfolk plant. A lectromelt furnace is an electric furnace used to melt steel from which castings are poured. An armature for the D.C. generator used in the melting processing cost $726.00. The remainder of the expenditure, $6,100.00, was for a new furnace shell, the vessel in which steel is melted. A furnace shell is a separate unit of the larger furnace, itself made up of component parts.The new furnace shell replaced one that had been in use for about 20 years. OPINION During 1963 *276 through 1967, petitioner owned and maintained three buildings on Ocracoke Island, North Carolina, where it regularly entertained employees of its major customer companies. Petitioner incurred substantial expenses in connection with its Ocracoke entertainment and claimed deductions therefor as depreciation and ordinary and necessary business expenses. In his statutory notices of deficiencies, respondent disallowed "in accordance with section 274 of the Internal Revenue Code" [6] deductions for the sums he determined to be "Ocracoke expenditures." The primary issue in this case is whether petitioner's Ocracoke-related entertainment expenses are deductible under the provisions of section 274. With certain exceptions, we hold for petitioner. Before proceeding to a discussion of section 274 and the bulk of the expenditures at issue, however, we think it appropriate to resolve the proper categorization of the expenses represented on Tables 5 and 7. Table 7 represents a portion of the total amounts disallowed by respondent as "Ocracoke expenditures" which petitioner maintains *277 were deductible expenditures unrelated to its Ocracoke entertainment. [7] The 1963 expenditures at issue here were for items, largely foodstuffs, of the type generally used at Ocracoke, however, and petitioner has offered no explanation of why it considers them non-Ocracoke related. We think they must be considered Ocracoke expenditures. The only other entry on Table 7, $23.23 in 1967, represents the cost of a restaurant meal for the Ocracoke caretaker and eight other Ocracoke employees. This expenditure is properly considered apart from the other Ocracoke expenditures, but at least in view of our ultimate cunclusion about the nature of petitioner's Ocracoke entertainment, its deductibility is sanctioned by section 274(e)(5) and section 1.274-2(f)(2)(v), Income Tax Regs., relating to expenses for employees. [8] *278 Respondent, meanwhile, has mounted a multi-faceted attack on the expenditures represented by Table 5. Phrasing his argument generally in the terminology of section 162, respondent argues that petitioner failed to show how the expenditures represented by Table 5 related to the entertainment of its customer-guests at Ocracoke. While respondent may be technically correct, in that no one testified specfically as to the purpose of these expenditures, each of them is included in petitioner's records introduced at trial and identified by petitioner's head bookkeeper and office manager to be Ocracoke expenditures. Furthermore, it requires no stretching of the imagination to relate photography with hunting and fishing trips or waitress costumes with waitresses serving meals in the Ocracoke facility dining rooms. Most important in this regard, however, is respondent's failure to designate prior to trial which expenses he thought not ordinary and necessary. The notices of deficiencies stated that "Ocracoke expenditures" were being disallowed "in accordance with section 274." Section 274 being strictly a disallowance provision, before its terms become applicable, a deduction *279 must be allowable under some other provision of the Code. Sanford v. Commissioner, 50 T.C. 823, 826 (1968), affd. per curiam 412 F. 2d 201 (2 Cir., 1969), certiorari denied 396 U.S. 841 (1969). See section 1.274-1, Income Tax Regs. Respondent did suggest in his trial memorandum that some of the expenses involved might not meet the requirements of section 162, but it was not until his initial brief was filed that he designated which expenses he had in mind. As a comparison of the totals from Table 2 and Table 5 reveals, particularly in light of the Table 5 expenses which must be disallowed on other grounds, the expenses now challenged on the basis of section 162 make up a rather small portion of the total expenditures in issue. As a practical matter neither the Court nor, we are sure, either of the parties would want an already burdensome record to be further burdened with questions and answers with respect to each expenditure if its business nature was not in dispute. [9] Under the circumstances we think the record supports the allowability of the Table 5 expenses as ordinary and necessary business expenses. [10] *280 Although we reject respondent's section 162 argument, we nevertheless sustain his determination that deductions for the expenditures represented on Table 6 must be disallowed. In his notices of deficiencies, respondent allowed petitioner deductions each year for business gifts in the lesser of the amount claimed or $2,500.00. Table 6 contains the costs of various gifts distributed at Ocracoke which petitioner has not shown satisfy the restrictions of sections 274(b)[11] *281 and (d), and the regulations promulgated thereunder. We come now to consideration of section 274 and deductibility of the expenses incurred by petitioner in connection with its Ocracoke facility and entertainment activities. With the enactment of section 274, effective as of January 1, 1963, Congress narrowed the class of entertainment expenses theretofore deductible under other provisions of the Code and established strict substantiation requirements with respect to entertainment expenses. Both parties have submitted lengthy briefs cataloging the development of section 274, and yet the substantive issue, as it has developed in this case, is largely a factual one. [12] *282 Respondent concedes that petitioner's Ocracoke facility was used primarily for the furtherance of petitioner's business but argues strenuously that neither the activity nor facility expenditures were directly related to the active conduct of its business within the meaning of section 274(a)(1). [13] *283 Although finding it "strange if business had not been a topic of conversation," respondent would have us characterize the Ocracoke visits as goodwill-oriented pleasure trips with business discussions arising only as a by-product of bringing a group of businessmen together. The record, however, does not support such an interpretation with respect to the regularly conducted entertainment of petitioner's customerguests. Rather, it clearly establishes that substantial and bona fide business discussions directed toward generation of income for petitioner arising from transactions stemming therefrom were both the reason for and result of these Ocracoke visits. Petitioner's *284 business of manufacturing machinery parts for other companies did not lend itself to media marketing but required personal contact between petitioner's sales representatives and employees of the companies to which petitioner sold its products. Petitioner had an ongoing business relationship with each of the customers it regularly invited to hunting and fishing trips at Ocracoke. The Ocracoke setting provided a congenial and relaxing atmosphere in which petitioner's sales representatives had several days of constant exposure to the individuals with whom they did business and with whom they were able to conduct the same types of business as when calling upon them at their offices. The record is replete with examples of specific projects that were the subject of business discussions held at Ocracoke. At times guests brought plans and specifications for jobs to be discussed over the course of an Ocracoke visit. By mixing the guests from several customers, petitioner was able to stimulate sales by making some companies aware of the work that it performed for others - within the context of specific examples. Respondent seeks to impugn the principal business character of all of petitioner's *285 Ocracoke entertainment by emphasizing the four uses of the facility identified on Table 4 and isolated bits of ambiguous testimony. The proper disposition with respect to the Table 4 uses, however, is disallowance of deductions for the expenses incurred in connection with these uses [14] *287 and for the appropriate fractional portion of the facility's total operational expenses. Section 274(a)(1). Nor do we think that the testimony of John William Gladstone, for example, justifies respondent's characterization of the Ocracoke entertainment. Gladstone was a technical service superintendent for Albemarle Paper Company, whose responsibilities were product quality control and customer services. Albemarle used Berkley products. Testifying in 1975, Gladstone indicated that he visited petitioner's Ocracoke facility on two occasions "about ten or twelve years ago," that he did not have direct contact with petitioner in the normal course of business, and although he realized that he was invited to Ocracoke because of his business position, that his primary purpose in going was to enjoy himself. Table 1 shows that in the period that Gladstone visited Ocracoke, petitioner was just beginning to *286 develop Albemarle as a customer. We do not think it unreasonable that petitioner might expect an individual in Gladstone's position to be one with whom it would deal in attempting to sell its products. We find it much more significant that Gladstone was not invited back to Ocracoke in later years, although other Albemarle employees visited there even after the taxable years here in issue. Moreover, Gladstone's testimony indicates that he was included in business discussions during the visits that he made. That petitioner may have misjudged at the outset of its relationship with Albemarle the extent to which Gladstone would be involved does not alter our conclusions about petitioner's expectations and active pursuit of business during its Ocracoke entertainment. Likewise, the occasional presence of family members of petitioner's business guests does little to detract from the strong showing of substantive business purpose of petitioner's Ocracoke entertainment. Respondent's reliance upon Handelman v. Commissioner, 509 F. 2d 1067 (2 Cir, 1975), and Hippodrome Oldsmobile, Inc. v. United States, 474 F. 2d 959 (6 Cir, 1973), is misplaced. Handelman involved expenses in connection with a sailing sloop on which the taxpayer claimed to entertain clients and potential clients in his law practice. The principal holding there was that the taxpayer failed to establish that the facility was used primarily for business purposes - - an issue conceded here by respondent. The court went on, however, "to conclude from this record that the taxpayer scrupulously avoided any encroachment on the glamorous atmosphere he wished to create so that he did not conduct any business on the boat." The record in this case establishes, to the contrary, that petitioner's customer-guests often brought problems for discussion at Ocracoke that had arisen after a trip was planned - complete refutation that business was an encroachment upon the atmosphere generated in the Ocracoke setting. The fact that entertainees initiated some of the specific discussions does not bring this case *288 within the ambit of Hippodrome Oldsmobile, Inc., however. In that case the court of appeals held on the basis of a factual finding that the taxpayer' srrepresentative "would not initiate business conversation" that entertainment expenses incurred under such circumstances were not "directly related to * * * the active conduct of the taxpayer's * * * business." This case does not involve such a factual finding. We do not doubt, as respondent argues, that petitioner engendered the goodwill of its customers by maintenance and use of its Ocracoke facility. Nevertheless, we are convinced that the principal character of the combined entertainment and business trips to Ocracoke was the active conduct of petitioner's business, to wit, to discuss business problems and needs of its major customers and inform them of the variety of functions that petitioner could perform within the context of specific jobs being done for others. Consequently, deductions for the expenses attributable to these uses are allowable under section 274(a)(1) and sections 1.274-2(c)(3) and 1.274-2(d)(4), Income Tax Regs.[15] *289 The basic substantive issue having been resolved, we must now consider whether petitioner has satisfied the rigorous substantiation requirements of section 274(d)[16] *290 for the expenditures incurred in the active conduct of its business. Pursuant to section 274(d), a taxpayer must establish five elements with respect to each entertainment expenditure - amount, time, place, business purpose, and business relationship. See sections 1.274-5(b)(3) and 1.274-5(c), Income Tax Regs. Petitioner did not maintain a separate diary on account book for its Ocracoke expenditures; rather, they were recorded in *291 its cash journals and general expense ledgers together with other business expenses. Petitioner did retain, however, invoices, receipts, and petty cash records which document each of the disputed expenditures recorded in its promotional sales and Berkley Manor supplies accounts. The petty cash records conisted of typed summaries of disbursements, made periodically as the account was replenished, and the appropriate supporting documents for those disbursements. The corporate books document all of the expenses involved herein.Respondent does not dispute the cost bases, useful lives, and salvage values assigned by petitioner to the assets on which depreciation was claimed, and he agrees that the amounts of expenditures are substantiated and that the place of entertainment was Ocracoke. Respondent also agrees that the time of each expenditure has been established, but he contends that the date of payment is insufficient to meet the requirement of section 1.274-5(b) (3)(ii), Income Tax Regs., which refers to "Date of entertainment. " Respondent argues that because of the time lag between when entertainment occurred and when bills were forwarded to and paid from petitioner's Norfolk *292 office, it is impossible to reconstruct the dates of trips without resorting to precisely the type of approximation that Congress intended to invalidate with the enactment of section 274(d). Respondent's reasoning may be correct, but it is based on an erroneous or inadequate view of the evidence.Contained in the data supporting the cash journal entries are numerous restaurant tickets which reflect dates that meals were taken. These tickets establish with specificity when guests were on the island. Some of the petty cash vouchers also reflect specific dates of the trips to which the reimbursed expenditures relate. Starting with the specific dates established by these documents, the other bills, invoices, and receipts can be related to particular dates of entertainment. This type of reconstruction is exactly what has led to our entries on Tables 3 and 4, and it establishes an accurate portrayal of the use of the Ocracoke facility. [17] *293 Disagreement over substantiation of the business relationship element revolves around respondent's contention that the nameofeachindividual entertained at Ocracoke must be identified and related to a particular visit and specific expenditures in order to satisfy the statutory requirement. Although many of the individual guests were identified at trial, petitioner's records persit only a determination of which companies' employees were present at Ocracoke on a particular occasion. If respondent's position is correct, petitioner has failed *294 to substantiate its business relationship with its Ocracoke entertainees for any use of the facility. Respondent cites as authority for his view the following language from Dowell v. United States,522 F. 2d 708, 716 (5 Cir., 1975), certiorari denied 426 U.S. 920 (1976): The substantiation statute says "the" - not "a" business relationship. And the business relationship cannot be ascertained unless the taxpayer establishes the identity of his entertainee - whether by name, title, or other specific designation. Although we think the plain language of the excerpt refutes respondent's contention, when placed in context it is clear that his interpretation is erroneous. The quoted language was written in reference to expenses that were not related to any particular entertainee. It is part of a discussion by the court of monthly statements introduced by the taxpayer without itemization of persons entertained, dates of entertainment, amounts of particular expenditures, and in some instances even the place of entertainment. The court was discussing the business relationship element in contradistinction to a showing of the business purpose of the expenditures. The district court's finding *295 of business purpose was upheld by the court of appeals, but it wished to make clear that establishing the business purpose element of substantiation is not tantamount to establishment of the business relationship element - even concededly business related entertainment expenses must be connected with some particular entertainee, whether by name, title, or other specific designation, in order to satisfy the requirement of section 274(d). Similar analysis disposes of respondent's reliance upon Bradley v. Commissioner,57 T.C. 1, 9 (1971). There, again, one defect in the taxpayer's evidence was his failure, with one exception, to relate particular expenditures to any person or persons entertained. We cannot read either of those cases, or the language of section 1.274-5(b)(3)(v), Income Tax Regs., to make the names of individuals a mandatory requirement in establishing business relationship. That it is the substance of the relationship and not the particular form of record-keeping that substantiates business relationship, when expenditures are connected with some entertainee, was made clear by our recent decision in Rutz v. Commissioner,66 T.C. 879, 885 (1976). In Rutz we found contemporaneously *296 maintained records that contained only the names of individuals who were guests of the taxpayer inadequate to substantiate business relationship. In this case respondent does not dispute that petitioner derived substantial income from the companies which employed the individuals entertained at Ocracoke (See Table 1). Petitioner's records show the companies whose employees visited Ocracoke on particular occasions, and most of the expenditures can be related to particular uses of the facility. With respect to those expenses not capable of being connected with a particular use of the facility, e.g. foodstuffs placed in storage for use during several entertainment periods, we think this a proper situation for application of section 1.274-5(c)(4), Income Tax Regs., relating to substantiation in exceptional circumstances where the taxpayer has presented the best evidence possible. In short, petitioner has substantiated its business relationship with the guests, and persons closely connected to them, employed by the companies with whom it did business. See Nicholls, North, Buse Co. v. Commissioner,56 T.C. 1225, 1235-1236 (1971). The business purpose of petitioner's Ocracoke entertainment *297 has likewise been established. Both petitioner's employees and its business guests testified regarding the nature of the business activity conducted at Ocracoke. Contrary to respondent's characterization of their testimony as vague and general, it provided in detail some of the specific jobs or projects discussed during certain visits to the island. Indeed, this evidence formed the basis for our finding the Ocracoke expenditures incurred were directly related to the active conduct of petitioner's business. Again we emphasize the ongoing business relationship between petitioner and the company-employers of its business guests, because that relationship set the tone for both the business benefits petitioner expected to derive from its Ocracoke expenditures and the nature of the business discussions engaged in there. The record does much more than establish that petitioner's guests were merely connected in some way with the companies with which petitioner did business. See Nicholls, North, Buse Co. v. Commissioner,supra, at 1236.Also significant is the total absence of evidence of personal friendships between petitioner's stockholder-employees and its business entertainees - a factor *298 that has led this Court on many prior occasions to seriously question the purported business purpose of entertainment expenditures. See, e.g., Rutz v. Commissioner,supra, at 886; Sanford v. Commissioner,supra, at 826-827. During the taxable year 1967, petitioner purchased an airplane at a cost of $86,487.90. On its income tax return for that year, petitioner claimed an investment credit in the amount of $6,054.14. Respondent disallowed both the investment credit and the depreciation deduction claimed with respect to the airplane based on his determination that the airplane was to be used in connection with petitioner's Ocracoke entertainment. Sections 38, 46, and 48 allow a credit against income tax for depreciable personal property placed in service during the taxable year. Section 1.46-3(d)(1), Income Tax Regs., provides that property will be considered as placed in service the earlier of: (i) The taxable year in which, under the taxpayer's depreciation practice, the period for depreciation with respect to such property begins; or (ii) the taxable year in which the property is placed in a condition or state of readiness and availability for a specifically assigned function, whether *299 in a trade or business, in the production of income, in a tax-exempt activity, or in a personal activity. In view of our finding that the Ocracoke facility and activities played an integral part in the active conduct of petitioner's business, we think the airplane constituted a depreciable asset placed in service in 1967 and the investment credit must be allowed. Expenditures on Machinery
The last issue to be considered is whether certain expenditures made by petitioner during 1965 and 1966 in connection with equipment used in its machine shop and foundry are currently deductible repairs expenses [18] *300 or capital expenditures subject to an allowance for depreciation. [19] *301 The test to be applied in distinguishing between the two categories is "whether the expenditure materially enhances the value, use, life expectancy, strength, or capacity as compared with the status of the asset prior to the condition necessitating the expenditure." Plainfield-Union Water Co. v. Commissioner,39 T.C. 333, 338 (1962). But while the test may be simply stated, it draws a rather shadowy line that makes it oftentimes difficult of applicability. Nevertheless, exercising our best judgment on the basis of the evidence placed before us, we have reached the following conclusions. With respect to the $7,906.88 of expenses incurred in connection with the turret lathe in 1965, $736.29 was paid to adapt the machine to a new and different use and therefore constitutes a capital expenditure. The remaining expenditures were incurred to return the machine to the degree of accuracy required in petitioner's business, i.e., keep it in an ordinarily efficient operating condition. They did not materially add to its value or appreciably prolong its life, and they are currently deductible as ordinary and necessary business expenses. Cf. Oberman Manufacturing Co. v. Commissioner,47 T.C. 471 (1967) *302 (expenditure to restore roof to pre-leakage condition, including some structural change, held repairs expense). The expenditures of $13,661.84 in 1966 for a large number of parts for a wheelabrator machine were also, in our opinion, ordinary and necessary business expenses. Expenditures to replace worn-out parts of a large machine, although capitalized originally as part of the cost of the entire asset, are properly considered repairs expenses when incurred to merely keep the machine in operating condition. Libby & Blouin, Ltd. v. Commissioner,4 B.T.A. 910 (1926). With respect to the $6,826.00 of expenses incurred in connection with petitioner's lectromelt furnace, however, we sustain respondent's determination. The furnace shall, costing $6,100.00, was a separate unit of the larger machine and itself had a useful life of about 20 years. There was insufficient evidence adduced with respect to the armature for us to decide on which side of the line it falls, and, therefore, the presumption of correctness attached to respondent's determination must prevail. Decisions will be entered under Rule 155. Footnotes
1. Subsequent to the years at issue in this proceeding, Drill Carrier Corporation was purchased by the Gardner-Denver Corporation. Prior to the merger, Gardner-Denver was the primary marketing force for Drill Carrier's product.↩
2. Mrs. Jones, Sr., visited the personal residence for only three or four weeks each summer, and she was apparently not connected in any manner with Berkley's entertainment activities on the island. No contention has been advanced by respondent that any expenses related to the personal residence are included in the amounts at issue herein.
3. The promotional sales account was not used exclusively to record expenditures related to Ocracoke, and this fact gives rise to the first matter discussed under the Opinion heading infra.↩ "Berkley Manor Supplies" was a code name used by petitioner to refer to its entire Ocracoke facility.
4. This reduction represents a proportionate part of the Ocracoke expenses allowed by respondent in the notice of deficiencies due to an employee meeting held at the facility in 1967.↩
5. The entry on Table 3 for 1967 includes the Berkley employees' meeting held at the Ocracoke facility, an additional variation from the general use of the facility. Respondent has conceded however, that the expenses connected with this use of the facility are allowable as deductions. See note 4, supra↩.
6. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
7. Petitioner claimed at trial that additional expenditures originally disallowed were non-Ocracoke related, but with the exception of those on Table 7, respondent has so conceded. ↩
8. As indicated by our prior notation of the virtual lack of mutuality between the expenditures represented by Tables 5 and 7, respondent does not argue that this expenditure was not an ordinary and necessary business expense.
9. Cf. Lickert v. Commissioner, T.C. Memo 1964-47↩. 10. Lest it not be clear, respondent's argument is based upon petitioner's failure to prove the relationship between these expenses and entertainment of its customers. Had respondent seen his way clear to develop the record with affirmative evidence, his argument might well stand in a different light.
11. Section 274(b) provides in pertinent part as follows: SEC. 274. DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC. EXPENSES. * * *
(b) Gifts.-- (1) Limitation.--No deduction shall be allowed under section 162 or section 212 for any expense for gifts made directly or indirectly to any individual to the extent that such expense, when added to prior expenses of the taxpayer for gifts made to such individual during the same taxable year, exceeds $25. * * * See footnote 16, infra, for the text of Section 274(d)↩.
12. The Congressional purpose and legislative history of section 274 have been examined in depth elsewhere, and we see no need to reiterate them here. See, e.g., Dowell v. UnitedStates, 522 F. 2d 708 (5 Cir, 1975), certiorari denied 426 U.S. 920 (1976); Hippodrome Oldsmobile, Inc. v. United States, 474 F. 2d 959 (6 Cir., 1973); St. Petersburg Bank & Trust Co. v. United States, 362 F. Supp. 674 (M.D. Fla., 1973), affd. 503 F. 2d 1402 (5 Cir, 1974), certiorari denied 423 U.S. 834↩ (1975).
13. SEC. 274. DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC., EXPENSES. (a) Entertainment, Amusement, or Recreation.-- (1) In General.--No deduction otherwise allowable under this chapter shall be allowed for any item-- (A) Activity.--With respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, unless the taxpayer establishes that the item was directly related to, or, in the case of an item directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), that such item was associated with, the active conduct of the taxpayer's trade or business, or (B) Facility.--With respect to a facility used in connection with an activity referred to in subparagraph (A), unless the taxpayer establishes that the facility was used primarily for the furtherance of the taxpayer's trade or business and that the item was directly related to the active conduct of such trade or business, and such deduction shall in no event exceed the portion of such item directly related to, or, in the case of an item described in subparagraph (A) directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), the portion of such item associated with, the active conduct of the taxpayer's trade or business.↩
14. Petitioner's records do not permit an allocation of expenditures between Atkinson Dredging Co. and the North Carolina legislators with respect to their joint use of the facility in 1967. Consequently, the total expenditures as set forth in Table 4 must be disallowed. Cf. sec. 1.274-5(c)(6)(ii), Income Tax Regs.↩
15. Because we hold for petitioner on the substantive issue on the basis of the directly related in general test described in sec. 1.274-2(c)(3), Income Tax Regs., we do not elaborate on its questionable but logically appealing argument that many of the expenditures come within the business meal exception of section 274(e)(1) and the corresponding regulations or its argument that Ocracoke constituted a clear business setting within the meaning of sec. 1.274-2(c)(4), Income Tax Regs.↩ Nevertheless we have considered these arguments sufficiently to determine that their applicability would not alter the result we reach with respect to the expenditures on which respondent's determination is sustained.
16. SEC. 274.DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC., EXPENSES. * * *
(d) Substantiation Required.--No deduction shall be allowed-- (1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home), (2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity, or (3) for any expense for gifts, unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility, or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift. The Secretary or his delegate may by regulations provide that some or all of the requirements of the preceding sentence shall not apply in the case of an expense which does not exceed an amount prescribed pursuant to such regulations.↩
17. In fairness to respondent, we should note that petitioner also failed to emphasize with precision the evidence by which the dates of entertainment are established. The chart appended to its initial brief was deficient in several respects and properly criticized by respondent. We think, however, that respondent has taken an entirely too critical view of petitioner's records as a whole. In his criticism respondent ignores, for example, that each of the facility uses set out in Table 4 is revealed in petitioner's records; those uses were not uncovered solely by third-party information, a factor which might tend to render suspect all of the entertainment expenses. We recognize that record-keeping in good form would do much toward eliminating this kind of litigation, and petitioner's records were not in good form, but we cannot and should not ignore the substance of the evidence placed before us.
18. Income Tax Regs., Sec. 1.162-4 Repairs.--The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as an expense, provided the cost of acquisition or production or the gain or loss basis of the taxpayer's plant, equipment, or other property, as the case may be, is not increased by the amount of such expenditures. Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, shall either be capitalized and depreciated in accordance with section 167 or charged against the depreciation reserve if such an account is kept. 19. Income Tax Regs., Sec. 1.263(a)-1 Capital expenditures; in general.-- (a) Except as otherwise provided in chapter 1 of the Code, no deduction shall be allowed for-- (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate, or (2) Any amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made in the form of a deduction for depreciation, amortization, or depletion.
(b) In general, the amounts referred to in paragraph (a) of this section include amounts paid or incurred (1) to add to the value, or substantially prolong the useful life, of property owned by the taxpayer, such as plant or equipment, or (2) to adapt property to a new or different use. Amounts paid or incurred for incidental repairs and maintenance of property are not capital expenditures within the meaning of subparagraphs (1) and (2) of this paragraph. See section 162 and § 1.162-4.